Bunn, Raiguel & Co. *versus* Gorgas.
"　　　"　　　" *versus* Watson.
"　　　"　　　" *versus* Howell.
"　　　"　　　" *versus* Stewart.
"　　　"　　　" *versus* Wood.
"　　　"　　　" *versus* Watson.

Anspach, Reed & Co. *versus* Upham, Tucker & Co.
"　　　"-　　" *versus* Watson.

*Constitutionality of the Stay Law of May 21st 1861.*

The provision of the 1st section of the Act of May 21st 1861, entitled "An Act relating to judgments and executions," which directs the courts to grant a stay of execution against a defendant, on proof of an agreement in writing to that effect by a majority of his creditors whose demands exceed two-thirds of the defendant's indebtedness, is in violation of that portion of the state and national constitutions which protects the inviolability of contracts.

ERROR to the District Court of *Philadelphia.*

These were writs of error sued out by the plaintiffs above named, who were defendants below in several actions entered in the District Court to July Term 1861.

The same question was involved in each of these suits, viz.: "Whether that portion of the first section of the Act of May 21st 1861, which provided for a stay of execution upon agreement by certain of defendant's creditors, is constitutional?"

The following affidavit was presented in the court below by the defendant in the case first above named:—

"City and county of Philadelphia, *ss.*

"Henry R. Raiguel being duly affirmed, according to law, doth depose and say, that he is one of the defendants in the above entitled action; that he annexes hereto a paper marked 'A.,' showing the names of the several creditors of said defend-

[Bunn, Raiguel & Co. *v.* Gorgas.]

ants, together with the amount due each of them, so far as the same can be ascertained; also a certain other paper marked 'B.,' which is a copy of the agreement of extension, signed by some of the creditors of said Bunn, Raiguel & Co.; and also a paper, 'Schedule C.,' showing the names of the creditors who have signed the said agreement of extension, and the amounts due each of them respectively. All these exhibits this deponent asks may be taken as a part of this affidavit.

"By the inspection of said papers, it will appear that more than one-half of the creditors of said defendants, whose demands exceed two-thirds of their entire indebtedness, have agreed to extend the time of payment of the debts due them respectively for the period of six, twelve, eighteen, and twenty-four months, from the first day of May, A. D. 1861—each payment to be for one equal fourth part of the amounts due them respectively.

"HENRY R. RAIGUEL.

"Sworn to and subscribed before me, this twenty-eighth day of June, A. D. 1861.

"C. BRAZER, Alderman."

(Here followed a list of the creditors referred to, and amounts due.)

On the twenty-ninth day of June, A. D. 1861, *O. W. Davis*, counsel for defendants, moved the court to direct the prothonotary to report the terms of the extension referred to in the foregoing affidavit.

Similar affidavits were made in the other cases, and rules entered as above; but the court below (SHARSWOOD, J.), on hearing the argument in one of the cases in which the plaintiff had not assented to the extension, but was opposed to it, delivered an elaborate opinion against the constitutionality of this provision of the Act of Assembly, and discharged the rule.

A writ of error was then sued out as above stated, and the following specification of error assigned:—

The court below erred in refusing the motion for an order directing the prothonotary to report the terms of the extension granted to the said defendants below by "the majority of their creditors," whose demands "exceeded two-thirds of their entire indebtedness," according to the provisions of the Act of Assembly, approved May 21st 1861.

Writs of error were also sued out in the other cases above named, which were all argued and considered together.

The case was argued by *H. M. Phillips*, with whom were *O. W. Davis* and *E. H. Weil*, for plaintiffs in error, who contended that the general provisions of the Act of May 21st 1861, were the same as those of the Act of 1857, after the suspension of specie payments by the banks of this Commonwealth, in order to relieve

[Bunn, Raiguel & Co. v. Gorgas.]

the business community. That the constitutionality of said Act of 1857 was not doubted, and no question of the kind was presented to the Supreme Court. That the Act of 1861 was passed with like purposes and intentions. That the powers of the state Assembly are, in effect, greater than those of Congress; and that state legislation must be upheld when the prohibition is not shown, though a contrary doctrine might prevail as to a national enactment.

That here the remedy is not taken away, but delayed, as has been done over and over again in the history of our legislation. How can the Stay Law be said to be uncertain, when the court is required to make an order designating and fixing the time at which the execution may issue?

This statute was intended to be *remedial;* it is therefore entitled to the most favourable consideration, and is not to be construed in the severe manner claimed.

The very fact that the stay is governed by a majority of the creditors, whose demands exceed two-thirds of the entire indebtedness, shows clearly that the debtor would not obtain an extended or indefinite time. The cases cited, Bronson v. Kinzie, 1 How. 311, and McCracken v. Hayward, 2 Id. 608, do not seem to meet the question now before the court.

The legislature may modify an existing remedy without violating the constitutional inhibition: Hepburn v. Curts, 7 Watts 300; Evans v. Montgomery, 4 Id. 218; Chadwick v. Moore, 8 W. & S. 49; Schenley v. The Commonwealth, 12 Casey 57; Jackson v. Lamphire, 3 Peters 290; Sturgis v. Crowninshield, 4 Wheat. 122; Ogden v. Saunders, 12 Id. 257; Phalen's Case, 1 Rob. 713; Phalen v. Virginia, 8 How. 163; Hirn v. State of Ohio, 1 Ohio 15; Baker v. Boston, 12 Pick. 194; Vanderbilt v. Adams, 7 Cowen 349; Coats v. The Mayor, 7 Id. 585.

The 41st section of the Act of 16th June 1836, relating to the discharge of insolvent debtors, &c., has been recognised by repeated decisions, and is enforced at almost every term of our courts.

*F. Carroll Brewster* and *W. A. Porter*, for defendants in error, contended:

I. The agreement was not within the law.

II. The law is clearly unconstitutional.

1. The contract sued on was entered into seven months before this law was passed. The law, at the date of the contract, is a part of the contract. 2. The act contains no saving clause for past contracts. 3. The act makes this claim subject to the agreement of strangers. 4. The act gives us no hearing, or opportunity of hearing. 5. The act makes the court the mere creature of its own officer, and gives the plaintiff no day in court, upon

[Bunn, Raiguel & Co. *v.* Gorgas.]

any quéstion as to signatures, amounts, fraud, or any other point in the case.  6. The act clearly impairs the obligation of a contract, when it renders recovery upon it subject to the vote of strangers, whose debts may be created, or consent may be purchased for the occasion.  They referred to the able opinion of the court below, and to the cases therein cited, viz.: Bronson *v.* Kinzie, 1 How. 311; McCracken *v.* Hayward, 2 Id. 605; and also to Curran *v.* Arkansas, 15 Id. 319.

The opinion of the court was delivered, April 21st 1862, by

WOODWARD, J.—The peculiarity of the Stay Law of May 21st 1861, which distinguishes it from all our other legislation of similar purpose, is, that it makes the right of a judgment-creditor to have execution against his debtor, dependent on the agreement of a majority of the creditors, whose demands exceed two-thirds of the debtor's entire indebtedness, and imposes no limit to the stay which the majority of the creditors may agree to.

When the defendant in any action that was pending at the date of the law, or which shall be instituted within twelve months thereafter for the recovery of the debt, "shall have filed an affidavit setting forth that the majority of his creditors, whose demands exceed two-thirds of his entire indebtedness, *have agreed in writing* to extend the time of payment of the debts due them respectively, the court shall direct the prothonotary to report the terms of the said extension upon evidence submitted to him by the defendant; and thereupon the court shall enter an order in the cause, that no execution shall issue, except at the periods when, and in the proportions which it shall appear by the report of the prothonotary that the majority of the creditors of the defendant, whose demands exceed two-thirds of his entire indebtedness, have agreed *as aforesaid*, to extend the time of payment of the debts due them respectively."

No discretion whatever is to be exercised by the court.  The prothonotary is to investigate and report the terms of the agreement, and then the court "*shall enter an order*" for carrying it into effect.  The agreement may extend the time for payment of defendants' debts indefinitely, and may prescribe any proportions that may suit the fancy or interest of a majority of creditors, representing more than two-thirds of the whole indebtedness. A judgment of a court of law is thus taken entirely out of judicial hands, and is committed, for purposes of execution, to parties who are not upon the record, nor in court, who have no judicial power, and can have none under our constitution; who may be non-resident citizens, women or children, and whose discretion is regulated by no legislative rule or restraint.  A creditor who holds a promissory note for $500, payable on a day fairly agreed to by the debtor, brings suit, and recovers a judg-

[Bunn, Raiguel & Co. *v.* Gorgas.]

ment in due course of law. It would seem reasonable that the court who rendered the judgment, and upon whose records it remains, should have power to award execution under such limitations and restrictions as the general law may have prescribed.

But according to the Act of 1861, the debtor has only to get two or more other creditors, whose claims together exceed $1000, to agree on an extension for one, five, or twenty years, and that agreement, when proved to the prothonotary, shall have the effect of suspending the powers of the court to execute its own judgment.

In all its features this is a very extraordinary enactment, but in the unlimited duration of the stay it provides for, it is without a precedent in our legislation. The general Execution Law of 16th June 1836, Purdon 330, limits very particularly the stay of execution. The 41st section of the same act, Id. 441, exempts after-acquired property of discharged insolvents from execution for seven years. The Stay Law of 16th July 1842, P. L. 407, provided for a valuation of the debtor's property, and stayed execution for one year after the return day of the writ, under which the valuation was to be made. So with the Act of 13th October 1857 (see P. L. of 1858 in App., p. 613), the stay therein provided was very expressly limited in duration. The legislature, whose province it is to provide all the remedies for collection of debts, have heretofore always exercised a discretion in regard to the duration of stay of execution. It has not intrusted that discretion to the courts, but has exercised it itself, by prescribing the limitation in the Stay Law.

This is the first instance in which the discretionary power has been committed to unknown and irresponsible parties, without stint, limitation, or qualification; the first instance, and it may be hoped it is the last, in which judicial records are subjected, not to a carefully considered rule prescribed by the legislature, but to such rule as the anybodies may prescribe, who chance to be a majority of the creditors of the defendant. We hold such a law to be unconstitutional. Though addressed to the remedy, it touches the contract in a most vital point, and impairs its obligation as directly as if it annihilated it.

It was this circumstance, the unlimited duration of the possible stay, that led to the condemnation of the Illinois statute, in McCracken *v.* Hayward, 2 How. Rep. 608, and it was the absence of this feature from our Stay Law of 1842 that rescued it in Chadwick *v.* Moore, 8 W. & S. 50. Gibson, C. J., put his opinion in that case on this very distinction. He speaks of the Act of 1842 as prohibiting *for a time* sheriffs' sales of property for less than two-thirds of the appraised value, and says, very pointedly, if the prohibition of execution were perpetual he would not hesitate to pronounce the act unconstitutional. The Act of

[Bunn, Raiguel & Co. *v.* Gorgas.]

1842 escaped judicial condemnation by virtue of a limitation on its face, which is entirely wanting in the Act of 1861. It may be said that the latter act does not in terms make the stay perpetual, nor exclude the possibility of the creditors prescribing a reasonable stay. Granted. But then it does give the creditors power to make the stay perpetual, or unreasonable. There is nothing to restrain or regulate their action. The vice of the act is, that it takes away from the judgment-creditor his remedies, not for a time deemed reasonable by the legislature and the courts, but as long as the majority of creditors representing more than two-thirds of the indebtedness choose to withhold these remedies. And what if the debtor has address, and means to bargain with such majority for a perpetual stay, are the minority to submit? The decree once recorded, binds the judgment-creditor, even though the debtor may pay off the creditors who made the agreement and dictated the decree. He may purchase total exemption from liability for one-third of his debts, by bargaining skilfully with those to whom two-thirds are due.

Constitutional provisions are mainly intended for protection of minorities. It is they who are most likely to be sacrificed in times of excitement or of distress, and hence the constitution never has a more legitimate operation than when it nullifies hasty and inconsiderate legislation, that disregards the rights of minorities.

It is idle to urge that the law under consideration is a mere modification of the remedies of a contract, for it by no means follows, because a law affects only the remedy that it does not impair the obligation of the contract. The obligation of a contract, in the sense in which these words are used in the constitution, is that duty of performing it which is recognised and enforced by the law. And if the law be so changed that the means of legally enforcing this duty are materially impaired, the obligation of the contract no longer remains the same. In Curran *v.* The State of Arkansas, 5 How. 319, this was said to have been the doctrine of the Supreme Court of the United States from a very early period, and several cases are cited to prove it. What is a material impairing of legal remedies is a judicial question, and whilst I quite agree with the learned judge below, that this is not a happy distinction on which to rest the constitutional question, yet it is the ground on which the Supreme Court of the United States has placed it, and we must abide by it. In all doubtful cases we incline habitually in favour of the constitutionality of legislation, so that practically no great inconvenience is likely to arise from the imperfection of the rule we have to apply. The courts are not likely to think legal remedies *materially* impaired unless they really are so. They are more likely to consider mischievous modifications immaterial, than they are to treat

[Bunn, Raiguel & Co. *v.* Gorgas.]

necessary and reasonable modifications as material, within the meaning of the above rule.

We cannot doubt, however, about the materiality of the change of remedy, proposed by the Act of 1861. We think it is novel and dangerous legislation, and that it does essentially impair the obligation of the contracts upon which the defendants in error sued. When these contracts were made, and when some of them were sued, no such statute existed. If the act be sustained, it may become impossible ever to enforce performance of the contracts. The act creates the possibility of a perpetual suspension of remedies—of course of a suspension for a time that all courts of justice would deem unreasonable. It is therefore a plain violation of those provisions of the federal and state constitutions, which protect the inviolability of contracts.

> The decree of the court in refusing the motion in each of the above-stated cases is affirmed.